L. R. Schmaus Co., Inc. v. Commissioner. Louis R. Schmaus and Ella V. Schmaus v. Commissioner.
L. R. Schmaus Co. v. Commissioner
Docket Nos. 5361-63, 5362-63, 272-65.
United States Tax Court
T.C. Memo 1967-197; 1967 Tax Ct. Memo LEXIS 64; 26 T.C.M. (CCH) 959; T.C.M. (RIA) 67197; October 11, 1967
Arthur I. Gould and Charles F. Marquis, for the petitioner in docket No. 5361-63. Charles E. Prieve, Suite 1320, 735 N. Water St., Milwaukee, Wis., for the petitioners in docket Nos. 5362-63, 272-65. Denis J. Conlon and Myron A. Weiss, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent has determined deficiencies in the income tax of the individual petitioners, docket numbers 5362-63, 272-65 as follows: Addition
To Tax
Sec. 6653(a)
Year
Deficiency
1954 Code
1958
$ 5,139.30
1959
14,759.85
1960
25,580.34
1961
5,265.43
1962
1,181.67
1963
9,007.07
$ 450.35 and in the income tax of the corporate petitioner, docket number 5361-63 as follows: Addition
To Tax
Sec. 6653(a)
Year
Deficiency
1954 Code
1958
$60,092.05
1959
65,755.38
1960
27,101.00
$1,670.07
1961
50,563.54
The corporation has put 1962 and 1963 into issue by asking us to decide the size of the net operating loss incurred in those years, so that it can be carried back to 1959, 1960 and 1961. The respondent does not dispute *68 the existence of the net operating losses; however, he argues that several items having the same character as those which were challenged in his deficiency notice for prior years should be adjusted in determining the size of the corporation's net operating loss deduction. The following issues remain for disposition; some involve both the corporate and the individual taxpayers, others involve either the individuals alone, or the corporation alone: 1. As to the corporation, whether the amount of compensation paid to Louis R. Schmaus and to William Mammen was excessive for each of the years 1958 through 1961, and whether it was accrued in the proper year. 2. As to the corporation, whether its deduction for automobile expense was excessive because it included in each year in issue $600 of expenses incurred by its officers in using the corporation's automobile for their own personal purposes. 3. As to the corporation, whether it realized $6,000 additional income in 1960 because of its discharge from indebtedness to the F. R. Dengel Company in that amount. 4. (a) As to the corporation, whether it was entitled to deduct amounts paid to the Ozaukee Country Club in each year in issue *69 on behalf of its president; (b) If not, then as to the individual petitioners whether those same payments resulted in a constructive dividend to Louis R. Schmaus. 5. (a) As to the corporation, whether deductions for travel and entertainment expenses of its president's wife in the years 1958, 1960, 1961 and 1962 were proper. (b) If not, then, as to the individual petitioners, whether the payment of Ella Schmaus's convention expenses resulted in a constructive dividend to Louis R. Schmaus. 6. (a) As to the corporation, whether the gift of $600 worth of roofing materials to its vice president in 1960 by a firm with which it did a small amount of business caused it to receive income equal to the value of the materials; (b) If so, then, as to the individual petitioners whether this transaction resulted in a constructive dividend to Louis R. Schmaus. 7. (a) As to the corporation, whether it was entitled to deduct as Christmas bonus and gift expense in 1960, 1961 and 1962, sums withdrawn in cash by its president which he states he gave away in small amounts to employees and customers. (b) If not, then, as to the individual petitioners whether those same withdrawals resulted *70 in Louis R. Schmaus receiving constructive dividends. 8. As to the individual petitioners, whether Louis R. Schmaus received a constructive dividend in 1960 when the corporation paid for windows and carpeting which was installed in the home of his son-in-law, William Mammen. 9. As to the individual petitioners, whether they have established that the stock of Cape Copper Mines, Ltd., and Jeanette Minerals, Ltd., became worthless in 1961 so as to fix their right to a deduction. General Findings of Fact At all relevant times the individual and corporate petitioners were residents of, and had its principal office in Milwaukee, Wisconsin. They filed their calendar year tax returns with the district director of internal revenue, Milwaukee, Wisconsin. The corporate returns employed an accrual method of accounting. The cases were consolidated for hearing and opinion. For the sake of clarity, we note at the outset that Ella V. Schmaus is one of the individual petitioners solely because she filed joint returns with her husband, Louis R. Schmaus, who was the sole shareholder and president of the corporate petitioner during the years in issue. Significant concessions have been made *71 by all parties. However, both the corporate and the individual petitioners complain that the respondent's determinations were arbitrary and capricious. They therefore request that the presumption of correctness which usually attaches to his determinations be denied him. We have considered this argument but reject it because the record shows that the respondent was neither capricious nor arbitrary in his determinations. Two stipulations of fact were entered into and filed, one between the corporation and the respondent, the other between the individuals and the respondent. They are incorporated by this reference. Compensation Deductions Findings of Fact The respondent has determined that the bonus portions of the amounts claimed by the petitioner corporation as deductions during the years 1958 through 1961 for compensation (salary and bonus) to its president Louis R. Schmaus, sometimes referred to as Schmaus, and to its vice president William Mammen, sometimes referred to as Mammen, are not allowable. The following table shows the breakdown as between salary and bonus of the claimed deductions during the years in issue: Salary
Bonus
Total
1958
L. R. Schmaus
$18,350
$25,000
$43,350
W. Mammen
7,650
10,000
17,650
Total $61,000
1959
L. R. Schmaus
18,550
35,000
53,550
W. Mammen
7,950
5,000
12,950
Total $66,500
1960
L. R. Schmaus
18,200
35,000
53,200
W. Mammen
7,800
15,000
22,800
Total $76,000
1961
L. R. Schmaus
18,200
30,000
48,200
W. Mammen
8,875
20,000
28,875
Total $77,075
*72 Two reasons were given for the disallowances. First, in each of the four years the amounts disallowed were said to have been in excess of reasonable compensation for services rendered. Second, the disallowed portions were determined not to have been authorized during the years in which accrued as an expense. Turning first to the issue of the reasonableness of the compensation, the following condensed financial statements for the years in question give a picture of the size and profitability of petitioner corporation: As of December 31,
1958
1959
1960
1961
Current assets
$394,641
$363,329
$407,679
$417,334
Fixed assets
99,306
95,876
96,150
96,150
Less: Reserve for depreciation
42,553
44,915
49,843
52,834
Net fixed assets
56,753
50,961
46,307
43,316
Other assets
1,259
1,982
3,223
4,435
Total assets
452,653
416,272
457,209
465,085
Current liabilities
152,644
96,531
122,918
107,069
Paid-in capital stock
18,500
18,500
18,500
18,500
Earned surplus
281,509
301,241
315,791
339,516
300,009
319,930 [1]
334,291
358,016
Total liabilities
452,653
416,272
457,209
465,085
Dividends
0
0
0
0
*73 1958
1959
1960
1961
Sales
$1,103,553
$493,377
$887,480
$499,910
Less: Cost of sales
777,092
352,992
738,681
335,659
Gross profit
326,461
140,385
148,799
164,251
Less: Operating expenses
130,489
112,110
130,949
125,049
Net of above
195,972
28,275
17,850
39,202
Other income
4,403
2,709
4,231
1,424
Net operating profit
200,375
30,984
22,081
40,626
Less: Taxes, State and Federal
104,835
11,252
7,531
16,902
Net income
$ 95,540
$ 19,732
$ 14,550
$ 23,724
The petitioner corporation was formed in 1930 and succeeded to a proprietorship which L. R. Schmaus had operated since 1919. During the years 1958 through 1961 Schmaus was president and sole shareholder of the corporation. Schmaus began working as a journeyman plumber at the age of 13, and through study he educated himself to become a plumbing contractor. Ever since 1919 he has devoted his full time to plumbing, heating, piping, and air conditioning contracting. In addition Schmaus taught himself the engineering skills necessary to become a consultant to architects on plumbing matters. *74 So proficient and respected a sanitary consultant did Schmaus become that he served as one of the drafters of the plumbing section of the Wisconsin Building Code. Finally, as a measure of how he was regarded by other plumbing contractors, it was shown that at one time or another he had been an officer of five different trade associations of plumbing contractors. Among members of the Wisconsin Association of Plumbing Contractors, Schmaus was regarded as the "dean of public contractors." The petitioner corporation's vice president, William Mammen, was a refrigeration engineer and a graduate of the Milwaukee School of Engineering. He was a full-time employee of the corporation from 1943 until his death in 1964. Mammen was the son-in-law of Schmaus. There were no other employees who had executive responsibilities. The office of secretary-treasurer was a formality and was filled during 1958 and 1959 by the bookkeeper Marilyn Schwan, and during 1960 and 1961 by a construction worker Norman Schwan. The corporation was involved in all aspects of the plumbing contracting business: plumbing, heating, ventilating, piping and air conditioning. During the years in question, its gross sales *75 ranged between $490,000 and $1,100,000. The number of employees fluctuated, depending on how much construction was in progress; however, during 1961, when gross sales were comparatively low, there were between 50 and 60. Managerial responsibility was divided up in a very simple manner. Petitioner's vice president, William Mammen, was general supervisor in charge of all work done outside the office and supervised all of the crews. Schmaus was in charge of everything else. Schmaus and Mammen, together with a bookkeeper, performed all the executive and administrative tasks necessary to petitioner's business. In addition to its contracting business, the petitioner corporation made available to architects the services of its president in the capacity of a "Sanitary Consultant." In such capacity he would be engaged to design the plumbing layout of a building. This is a service which contractors do not normally render separately from jobs on which they are bidding. It was offered in order to enhance the corporation's reputation and to provide extra revenues. The following figures, which reflect payments for engineering services rendered separately from contracts bid upon, show the *76 size of this aspect of the corporation's business: 1958
$34,729.19
1959
22,648.02
1960
20,754.37
1961
20,317.54
Other engineering services, which were performed in connection with petitioner corporation's construction business, were billed as part of the contract price and were not accounted for separately. These extra services were performed by Schmaus and Mammen and involved a great many additional hours of labor and much extra responsibility. In 1965, when Schmaus was 76 years old, he was employed at a rate of $18,200 per year by the then owners of the corporation who had just purchased 90 percent of his stock. After selling his stock in 1965 Schmaus stayed on as president of the company, but due to the deaths of his son-in-law in early 1964, and his wife and daughter in the first part of 1965, he was unable to think as clearly as before. The average annual earnings of petitioner's ten highest paid employees, other than Schmaus and Mammen, ranged from approximately $7,200 to $9,500 per annum. Such employees were construction workers who were members of unions and were paid on an hourly basis. Proper Time For Deducting Bonus Portion of the Above *77 Compensation The decisions to pay bonuses were made at the annual meetings of the board of directors. The corporation kept its books on the calendar year basis and used an accrual method of accounting. It accrued its liability for bonuses in the year when the work was performed, but they were not paid during that year, and the minutes authorizing such bonuses were dated in January of the following year. The only signature appearing on these minutes was that of Marilyn Schwan, secretary of the board of directors during the years in question. She took notes at the meetings and typed them up afterwards. We find that bonuses were authorized on the dates recited and for the amounts stated in the corporation's minutes as summarized below: Date of annual meeting of board
of directors as recited in minutes
1/4/58
1/3/59
1/8/60
1/7/61
Schmaus
$15,000
$18,000
$25,000
No bonus was mentioned
Mammen
$ 5,000
$ 7,500
$ 5,000
No bonus was mentioned
Opinion The respondent has assigned two reasons for this disallowance of the bonus portions of the amounts which petitioner deducted as compensation to its officers during 1958 through *78 1961. He argues that the compensation was unreasonable in amount, and that bonuses were accrued as an expense in the wrong year. Turning first to the issue of reasonableness, we discover that to be deductible the total amount of compensation paid or accrued must be reasonable in amount and for necessary services actually rendered. Section 162(a), [2]section 1.162-7, Income Tax Regs. What is in fact reasonable compensation for rendering particular services is, in the last analysis, a question of fact. Huckins Tool and Die, Inc. v. Commissioner, 289 F. 2d 549 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court; Ben Perlmutter, 44 T.C. 382, 401 (1965), on appeal (C.A. 3, 1965). Many different factors are relevant in deciding what is reasonable, and the weight to be assigned to each varies in every case. Among the more important ones are: "The nature of the services to be performed, the responsibilities they entail, the time required of the employee in the discharge of his duties, his capabilities and training, and the amount of compensation paid in proportion *79 to net profits." Patton v. Commissioner, 168 F. 2d 28, 31 (C.A. 6, 1948), affirming a Memorandum Opinion of this Court. The respondent has chosen to place primary reliance on the presumption of correctness which attaches to his deficiency notice. He has pointed out that the instant case involved a closely held corporation in which arm's-length bargaining was not present. We have noted this fact and consequently subjected the facts to particularly close scrutiny. He has also pointed to the $18,200 yearly salary which Schmaus received after he sold 90 percent of his stock in the corporation. However, we are unable to draw the inference which respondent asks, because we have found that Schmaus was worth less to the corporation in 1965 because of his increasing age and because the series of personal tragedies which had claimed the lives of his wife, daughter, and son-in-law were burdening him. He testified that he could not think as clearly after these tragedies, and we believed him. We do not feel that the rate of compensation which Schmaus received subsequent to the sale of his stock in 1965 is indicative of the worth of his services from 1958 through 1961. Finally, *80 the respondent argues that because the bonuses were paid only after each year's profits were ascertainable and because no dividends were paid, that the bonuses were in fact disguised dividends. We disagree with this analysis on several grounds. To begin with, the issue in this aspect of the case is not when bonuses were declared, but whether they were reasonable compensation for necessary services actually rendered. We have found that the primary purpose of declaring the bonuses was to compensate Schmaus and Mammen for the extra work they did in rendering consulting services. However, it was only at the end of the year that the value of such services could be calculated. There was no way to know at the beginning of the year how much consulting work they would be asked to or be able to do. Secondly, the significance of a corporation's failure to declare a dividend depends on all the facts of any given case. By itself, the decision not to declare a dividend is of no particular importance, especially when no other evidence suggests a scheme to disguise the payment of one. Here, substantial earnings remained each year after payment of the compensation in question. Had Schmaus withdrawn *81 all, or a large percentage of earnings in the form of bonuses to himself and Mammen, there might exist a basis for inferring the existence of a scheme to disguise dividend payments. The corporation's decision to reinvest its earnings in the business, instead of paying them out in the form of dividends, gives rise to no inference of a scheme to make disguised payments. For its part the petitioner corporation has shown that its president embarked on his career as a journeyman plumber at the age of 13, and by educating himself was able to become a contractor. He has had over forty years experience in the plumbing, heating, and general construction contracting business. In addition to operating a contracting business, he also taught himself the technical aspects of plumbing and heating design. Although he never obtained a technical degree, it is clear that he possessed a great deal of engineering knowledge, because he was frequently hired by architects as a consultant to design and draw the plans for the plumbing in a building which they were designing. Furthermore, he was a consultant to the State of Wisconsin on the plumbing section of its building code. In addition to the above *82 qualifications, a final factor which persuades us that Schmaus was a man of great ability is the excellent reputation he enjoyed among other plumbing contractors. Testimony on this matter was given by the executive secretary of the Wisconsin Association of Plumbing Contractors, Robert Hammersmith. Hammersmith had been employed by the association as its secretary since 1946, and was well qualified to testify as to Schmaus's reputation. Another factor we have considered is the extent of the services Schmaus rendered the petitioner corporation. Not only did he manage and operate contracting operations, he also assumed primary responsibility for the consulting services which it made available to architects. This consulting service required many additional hours of labor, and because of its nature it involved meeting deadlines; consequently it was often necessary for Schmaus to work late into the night and on weekends. The magnitude of petitioner corporation's consulting service can be judged by noting that in none of the four years in question (1958-1961) did it produce less than $20,000 additional revenue. We have also considered the reasonableness of the claimed deductions in the *83 light of the amount paid for like services by like enterprises under like circumstances. Section 1.162-7(b)(3), Income Tax Regs. On this aspect of the case we were impressed with the forthright and direct testimony of Frank Ruppert, who was well qualified. William Mammen was admirably suited to be petitioner's vice president. He was a refrigeration engineer and a graduate of the Milwaukee School of Engineering. Furthermore, he had worked for the petitioner continuously since 1943. His duties were extensive, as he was general supervisor for all the corporation's outside work. In such capacity he had direct responsibility for overseeing all the work under construction and making those decisions which had to be made on the spot. Additionally, he worked with Schmaus in rendering consulting services to architects. As a consequence, he too had to put in many extra hours of labor. Further persuasive evidence is found by looking at the average annual earnings of petitioner's ten most highly paid construction workers. Their compensation ranged from $7,200 to $9,500 per annum, yet the respondent allowed Mammen only $7,650 to $8,875. We now consider whether the disallowed compensation *84 was properly accruable in the year in which it was claimed. Fundamental to our disposition of this issue are our findings, first, as to when the annual board of directors meetings at which the bonuses were authorized were held and, secondly, as to the size of the bonuses thus decided upon. We have chosen to rely on the minutes themselves as to the time of the meetings and the amount of the bonuses declared, because they impress us as being the most reliable account of the facts. We were unable to find, as Schmaus testified, that contrary to the minutes' explicit recitations, these annual meetings were actually held in November or December of the year prior to the one recited in the minutes. We note that Marilyn Schwan, who was secretary of the board of directors during the years in question, was neither called as a witness nor shown to have been unavailable. We weigh this failure against petitioner because she would have been uniquely qualified to testify as to when the directors' meetings took place, having taken the notes at the meetings and typed up the minutes afterwards. In fact, hers is the only signature on the minutes for each of the four years, 1958 through 1961; the other *85 directors not having bothered to sign. The other members of the board were William Mammen and Ella V. Schmaus; both died prior to the time of the trial, and therefore were unavailable. The respondent bases his disallowance on the theory that before a deduction for compensation may be accrued, the petitioner must establish that all the events have occurred which fix the amounts payable with reasonable accuracy and determine the petitioner's liability to pay. Section 1.461-1 (a)(2), Income Tax Regs. United States v. Anderson, 269 U.S. 422 (1926). Applying this rationale to the present facts, he asserts that the time of authorization of the bonus is the proper time to accrue the liability. We agree. The taxpayer's officers in Bauer Bros. Co. v. Commissioner, 46 F. 2d 874 (C.A. 6, 1931), certiorari denied 283 U.S. 850 (1931), affirming 9 B.T.A. 392, had decided upon the amount of a bonus and the men to whom it was to be paid, but it was not formally authorized until a later year. It was held that the proper time for accrual was after the bonus had been formally authorized. The court reasoned that only upon authorization did the mere *86 promise of a bonus ripen into an enforceable obligation of the sort which fixes liability for tax purposes. In the instant case, it was understood that the bonuses would be paid to compensate for the long hours spent in performing engineering and drafting services. However, it was only after the close of each year that the amounts of the bonuses were determined and formally authorized. It was then that "all the events" had occurred to fix the liability, and it was therefore the proper time to accrue the liability for the bonus. Federal Machine & Welder Co., 11 T.C. 952 (1948), affirmed per curiam 184 F. 2d 843 (C.A. 6, 1950). Under the rule in Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930), compensation for services rendered in a prior year may be deducted in a subsequent year. Therefore, the proper amount for the petitioner to have deducted in each of the four years in question was the amount authorized at the board of directors' meeting held during that year. This amount was properly accruable when authorized. Because the petitioner has been improperly accruing the liability for bonuses in the year in which the work was performed, the *87 respondent was correct in disallowing the deductions in the year when they were claimed. We now hold that the petitioner is entitled to deduct the amounts of the bonuses which were shown to have been actually authorized in the minutes in each of the years in question. Under the facts of this case, we are unwilling to denominate as bonus any amounts paid over and above those authorized by the minutes. Therefore, the corporate petitioner may deduct the following amounts as compensation to Schmaus and Mammen for the years 1958 through 1961: $46,000, $52,000, $56,000, and $27,075. Automobile Expense Findings of Fact The petitioner corporation owned and operated an automobile in each of the years 1958 through 1963. Schmaus used this car occasionally for pleasure. Mammen was not denied use of this car. Mutual concessions have removed the automobile expense issue from the individual taxpayer's case, and all that remains is the issue of the corporation's right to deduct $600 of automobile expenses annually. Opinion The respondent has determined that $600 of the corporate petitioner's claimed deduction for automobile expense in each of the years 1958 through 1961 was not an allowable *88 deduction. He has also refused to allow a deduction of the same amount for the computation of the loss carryback from 1962 and 1963. In all but the first of the years in question, the reason assigned for the disallowance was that $600 represented the value of personal use of the corporation's automobile by its officers. However, in 1958 a clerical error in respondent's deficiency notice assigned the following reason for the disallowance: "The amount of $600 represents non-personal expenses of the officers." [Emphasis supplied.] The petitioner does not assert (and indeed there would be no substantial basis for doing so) that it was not put on notice that the 1958 automobile expense deduction would be challenged. The respondent points to A. Finkenberg's Sons, Inc., 17 T.C. 973 (1951), where, on facts similar to the ones in the instant case, we held that an error in the stated ground for the deficiency was not fatal when the deficiency was otherwise correct. There, as here, the contested issue was fully discussed in the briefs, and the taxpayer had an opportunity to, and did, present evidence at trial. The petitioner has not been prejudiced in any way, and we therefore *89 hold that the deduction of $600 for automobile expense in 1958 was properly put in issue. Turning now to the merits of this issue, we hold that petitioner has failed utterly to carry its burden of proof. The respondent contends that each year's $600 disallowance arose because Schmaus and Mammen each used the company car for personal purposes to the extent of $300. Schmaus has conceded the automobile expense issue in the individual case to the extent of $300 per year, and testified that he occasionally used the car for personal purposes. What little evidence there is negating the extent of Mammen's personal usage is insufficient to overcome the presumption attaching to respondent's determination. Respondent's determination that in each of the years 1958 through 1961 the corporate petitioner improperly deducted $600 of automobile expenses is therefore upheld. Similarly, respondent's disallowance of the same amounts in 1962 and 1963 in computing the size of each year's loss carryback deduction was proper. Discharge of Indebtedness Findings of Fact From 1952, the first year for which the corporate petitioner's records were introduced, through 1953, the account entitled notes *90 payable contained a balance of $2,000; in 1954 the balance in the account grew to $6,000 where it remained through 1962, the last year for which records were introduced. We find that the corporation's notes payable account represented a liability to the F. R. Dengel Co. Dengel was the wholesale supplier of plumbing and heating equipment from which L. R. Schmaus Co., Inc., purchased almost all of its materials. Certain purchases made by the petitioner in the late 1940's and early 1950's gave rise to a dispute, and rather than paying for the goods on the tenth of the month, as was the petitioner's usual practice, one or more notes were given in satisfaction of its obligations. Although these notes were never paid, the petitioner continued doing business with F. R. Dengel Co. on the same credit basis it had previously used. The notes themselves were never introduced into evidence; no one from Dengel Co. testified about them; and the corporate petitioner's accountant Frank Ruppert, who began working for it in 1961, never fully understood the entry on the books which his predecessor had made in recording them. Nothing in the testimony or exhibits indicates that the notes were sealed instruments. *91 Opinion The respondent has determined that during the year 1960, L. R. Schmaus Co., Inc., was discharged of indebtedness in the amount of $6,000 which it owed to F. R. Dengel Co. Accordingly, taxable income for 1960 has been increased under the provisions of section 61(a)(12) to reflect this determination. The burden is on the petitioner to show that respondent's determination is incorrect. To this end the petitioner argues that the Wisconsin statute of limitations has not yet run, and that therefore it is still liable on the notes. The weakness in the petitioner's approach is that the relevant Wisconsin 6-year statute (Wis. Stat. Sec. 893.19(3)(1965)) presumptively ran in 1960, since the account had been static since 1954. Looking at the facts of the instant case, a strong inference arises that in order to keep a good customer, the Dengel Co. decided to refrain from collecting on the notes. This conclusion is supported by the fact that the notes in question came into being as settlement of a controversy about some materials, and that even though they were never paid, the petitioner and supplier continued to do business as usual for many years afterwards. *92 In all events, the petitioner's argument that his liability on the notes is governed by the 20-year statute of limitations contained in Wis. Stat. Sec. 893.16(2) (1965) fails, because the above statute applies only to sealed instruments, and there is no evidence in the record to support the proposition that the notes in question were sealed. Nothing of record is inconsistent with the respondent's determination that the liability to F. R. Dengel Co. was discharged in 1960, and we therefore hold that petitioner has failed to sustain his burden of proof. The respondent's determination on this issue is upheld. Country Club Bill Findings of Fact During the years 1958 through 1963, L. R. Schmaus Co., Inc., paid some part or all of its president's bill at the Ozaukee Country Club. Schmaus joined this club, which was in or near Milwaukee, in 1955. He did so to meet people who might give him business and to take exercise. He did meet people there with whom he did some business, and the corporation was hired to do some work for the club itself. Schmaus entertained an insignificant number of people at the club, and used it for his own personal enjoyment by occasionally *93 playing a few holes of golf and dining there alone. Opinion The respondent has determined that, during the years 1958 through 1961, the corporate petitioner deducted as expenses excessive amounts for "Association Dues and Subscriptions." He has also disallowed such expenses in computing the loss carryback deduction from 1962 and 1963. The amounts in question involve moneys paid by the corporation to the Ozaukee Country Club on behalf of its president. It is not clear exactly what it was that the corporation paid, and the petitioner has chosen to describe the amount which it contends was improperly disallowed as: "certain expenses * * * with respect to country club dues and fees incurred * * * while entertaining customers." The respondent has determined a second deficiency arising out of the same facts as against Schmaus. Respondent argues that if the corporation is found to have improperly deducted as an expense the amounts paid to the Ozaukee Country Club on behalf of its president, that he, as its principal shareholder, must have received a constructive dividend. At trial, neither petitioner produced any books, records, or memoranda to document the claim that all amounts *94 paid by the corporation were, in effect, reimbursements made by it to Schmaus for ordinary and necessary expenses which he incurred in the course of its business. The only evidence offered was Schmaus's oral testimony. He stated, and we have found, that he joined the club in 1955 both to meet people who might give him business, and to take exercise. We found that he did business with some of the members, but we were unable to find a connection between any particular expenses incurred and particular business the corporation received. Schmaus testified that the corporation performed work for the club itself, which he felt the corporation would not have been asked to do if he had not been a member. This testimony is too conclusory to be persuasive, and without other supporting evidence, we cannot find that belonging to the club automatically resulted in his company's getting the business. Furthermore, no attempt was made to relate any particular club expense to obtaining this business. Although we found that Schmaus joined the club because he thought it would help business, we are not able to find that his continued membership was solely for business purposes. *95 Chas. D. Long, 32 T.C. 511 (1959). In fact, it is clear that he used the club for personal reasons. Although, it is true that the membership may have been beneficial to the corporation's business in a general way, this alone is not sufficient to allow it to deduct his dues as an expense. As we said in Louis Boehm, 35 B.T.A. 1106, at 1109 (1937): Whether or not a particular expenditure is a deductible business expense turns on the facts of each case and the burden of proof is on the petitioner to show that such expenditures were primarily business rather than personal expenses. We do not think the burden of proof is met by the petitioner's argument that in general, membership in social, political, and fraternal organizations is helpful in obtaining clients through contacts made thereby * * * Prior to 1963, the year in which section 274 became effective, club dues were deductible if they were ordinary and necessary expenses within the meaning of section 162. However, "substantial evidence is required to * * * establish a right to deduct club dues." *96 Western Products Co., 28 T.C. 1196, 1218 (1957). In evaluating a particular case several factors must be considered. Some of these are the purpose of the membership, the extent to which the membership is used, and the relationship of the use of the membership to the business activities of the taxpayer. Where, as here, the sole purpose of the membership is not found to be for business purposes the taxpayer is free to show approximately what percent of the total use of the club was related to its business. The petitioner has introduced no evidence as to how much its president used the club for business purposes. Furthermore, the petitioner has introduced no evidence of the relationship between its plumbing contracting business and its president's membership. Schmaus testified that he took an insignificant number of guests to the club; this suggests that the plumbing contracting business did not require him to entertain much, and that therefore the membership was not essential to his doing his job. On the meager evidence presented to us, we are unable to find that the petitioner has carried the burden of proving that any dues which were paid for its president during 1958 *97 through 1962 were ordinary and necessary expenses of its business. A. T. Miller, 39 T.C. 940 (1963). Entertainment expenses are deductible according to the same standards as club dues; they must be ordinary and necessary expenses within the meaning of section 162. As we said in John A. Guglielmetti, 35 T.C. 668, 672 (1961): To be so deductible, the expenditure must have some definite, reasonable, and necessary purpose connected with the taxpayer's business and must also be reasonably calculated to accomplish the end sought. Louis Bochm, supra; James Schulz, 16 T.C. 401 (1951). Here the petitioner has explained nothing about its "fees incurred while entertaining customers." It has made no attempt to itemize its president's expenses, or even segregate them from the amount spent for his dues. If customers were entertained, no names or dates have been introduced to document the fact. Furthermore, no particular business has been shown to be related to any part of the expenses. Even if we had found, and we did not so find, that the work which the corporation did for the Ozaukee Country Club was received as a consequence of Schmaus's *98 belonging to the club, we have been given no rational basis upon which to hazard a guess as to the amount of expenses properly attributable to such work. In Reginald G. Hearn, 36 T.C. 672 (1961), affd. 309 F. 2d 431 (C.A. 9, 1962), certiorari denied 373 U.S. 909 (1963), we were faced with similarly inconclusive evidence. We held there, and we reaffirm that although sworn testimony may be adequate in appropriate cases: the testimony here was so general and of such summary and conclusory character that, in our opinion, petitioner has wholly failed to carry the burden of proof, * * * as to the necessary proximate relationship between the alleged expenditures and his business. The expenses in question are of such nature as to afford considerable opportunity for abuse, and it is not too much to ask of a taxpayer seeking the benefit of such deductions that he offer * * * reasonably satisfying proof * * * No such satisfying proof has been offered, nor were we able to find the necessary proximate relationship between the moneys paid by the corporation to its president's country club and the company's business. *99 Because, on the record before us, we are unable to find that any of the claimed expenditures could qualify for deduction, there is no occasion to make an approximation such as was indicated in Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930); Eugene H. Walet, Jr., 31 T.C. 461 (1958), affirmed per curiam 272 F. 2d 694 (C.A. 5, 1959). For the year 1963 the deductibility of both dues and entertainment expenses must be measured by the additional requirements of section 274. As to dues, section 274(a)(2)(A) states that dues paid to a club shall be treated as "items with respect to facilities," and section 274(a)(1) declares that an "item" incurred with respect to a "facility" which is used in connection with an entertainment "activity" is deductible only if "the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business." (Emphasis supplied.] This means that no club dues are deductible unless the club is used primarily for business purposes. In deciding whether a taxpayer has "established" that a club was used primarily for business purposes, section 274(d)(2) requires the taxpayer to maintain *100 "adequate records or * * * sufficient evidence to corroborate his own statement." Among other things, these records must reveal the amount of the dues, the occasions on which the club was used, the business purpose of particular usages of the club, and the business relationship to the taxpayer of persons entertained or using the club. See also section 1.274-2(e)(4)(i), Income Tax Regs.
As to entertainment expenses, section 274(a)(1)(A) limits deductibility to those items which the taxpayer can establish were directly related to its business. Section 274(e)(1) exempts from the above requirement of section 274(a)(1)(A) the cost of "business meals." However, to establish a deduction for any entertainment expense, including business meals, section 274(d)(2) requires extensive documentation of the amounts spent, the time and place of the entertainment, the business purpose of the expense, and the business relationship to the taxpayer of the persons entertained. In computing the loss carryback deduction, the respondent has disallowed the amounts paid during 1963 by the corporate petitioner to the Ozaukee Country Club. The petitioner has introduced no additional evidence concerning the *101 payments made during 1963. The evidence for the years 1958 through 1962 was inadequate to establish that the payments in question were ordinary and necessary expenses. A fortiori, this same evidence does not satisfy the substantiation requirements of section 274(d). We therefore hold that deductions for amounts paid to the Ozaukee Country Club in 1963 on behalf of petitioner's president were also properly disallowed. Turning now to the individual petitioner, the respondent has determined that all amounts which the corporation paid to the Ozaukee Country Club on Schmaus's behalf from 1958 through 1963 were constructive dividends to him. Although the respondent does not fully develop his theory, it is well settled that where a dominant shareholder causes corporate funds to be disbursed for his personal use, and where he has no intention of repaying them, the amounts so disbursed are the equivalent of corporate distributions to him. Greenspon v. Commissioner, 229 F. 2d 947 (C.A. 8, 1956), affirming 23 T.C. 138 (1954). These distributions are either additional compensation or constructive dividends, depending on the facts of the case. *102 Alex Silverman, 28 T.C. 1061 (1957), affd. 253 F. 2d 849 (C.A. 3, 1958). It makes no difference that none of the formalities of a dividend declaration are observed, that the disbursement is not recorded on the corporate books, that it is not in proportion to stockholdings, or even that some stockholders do not participate in its benefits. Irving Sachs, 32 T.C. 815 (1959), affd. 277 F. 2d 879 (C.A. 8, 1960), certiorari denied 364 U.S. 833 (1960). The taxpayer may show that there were not "earnings and profits" available in the corporation out of which a dividend could be paid, but the petitioner has the burden of proof as to this matter, and where, as here, the corporate returns indicate that there were sufficient earnings and profits available, the respondent's determination that the amounts in question are taxable to the individual petitioner as constructive dividends has been sustained. American Properties, Inc., 28 T.C. 1100 (1957), affirmed per curiam *103 262 F. 2d 150 (C.A. 9, 1958). Schmaus argues that even if the funds paid by the corporation to the Ozaukee Country Club are not found to constitute ordinary and necessary expenses of the company, they are not income to him. He claims to have received no benefit from the expenditures. The inarticulated premise in this argument is that whatever amounts were paid to the club on Schmaus's behalf were equal to expenses he incurred in the course of the corporation's business, and that therefore he received no net benefit. But no evidence was introduced which supports such a thesis, so we do not consider it. We know only that the petitioner kept no records of any business uses to which he put the club, and that he is therefore unable to connect any business the corporation received or bid on with any particular entertainment activity. In addition, he testified and we found that he entertained an insignificant number of people at the club. On these facts, we are unable to find whatever benefit he received from having his club bill paid was offset by expenses he incurred in the course of his corporation's business. From the facts which we have found, it is clear that Schmaus *104 benefited by having his club bill paid. That his corporation may also have derived indirect benefits in no way diminishes the quantity of the benefits he received. Had Schmaus been able to show that a certain portion of the total amount of use he made of the club was related to the corporation's business, we could allocate his dues and expenses accordingly. The mere showing that his membership was "good for business" will not support any such allocation. Without evidence that any of the expenses Schmaus incurred at the Ozaukee Country Club were for the benefit of his corporation, we hold that its payment of his club bill from 1958 through 1963 resulted in his receiving constructive dividends. The respondent's determinations on this issue are therefore upheld. Convention Expense of Wife Findings of Fact In 1958, 1960, 1961, and 1962 the corporate petitioner deducted travel and entertainment expenses arising out of the attendance of Louis R. Schmaus's wife, Ella V. Schmaus, at trade association conventions. The respondent has disallowed deductions for these claimed expenses. At the insistence of her husband, Ella Schmaus attended the conventions where she participated in the *105 ladies' auxiliary. There is no factual basis disclosed by the record for determining the nature of the activities of the ladies' auxiliary. Her expenses were paid by her husband, who was subsequently reimbursed by the company. Opinion The respondent has determined that in 1958, 1960, and 1961, the corporate petitioner's deductions for travel and entertainment expenses were excessive. Such disallowed sums were attributable to the expense of the wife of the president of the corporation in attending trade conventions with her husband. These disallowed travel expenses have been attributed to the individual petitioners as additional dividend income in the years 1958, 1960, 1961, and 1962. Although we do not doubt that Ella Schmaus attended trade conventions with her husband, the proof offered was inadequate to carry the burden of proving that her expenses were ordinary and necessary business expenses within the meaning of section 162. The regulations suggest two criteria which are of first importance in determining the deductibility of such expenses. The first of these, section 1.162-2(c), Income Tax Regs., requires a showing that a wife's presence on a business trip has a bona *106 fide business purpose. The second, section 1.162-2(d), Income Tax Regs., requires a "sufficient relationship between the taxpayer's trade or business and his attendance at the convention * * * so that he is benefiting or advancing the interests of his trade or business." The petitioners have shown no business purpose which was served by Ella Schmaus's attendance at the plumbing contractors' conventions. Neither have they shown how her presence at the conventions advanced or benefited the business of the corporation. In the case cited by the petitioner, Warwick v. United States, 236 F. Supp. 761 (E.D. Va., 1964), elaborate proof was introduced to show that the wife's presence was necessary to the successful accomplishment of the husband's business objectives. The case involved a sales executive for a tobacco processing company. His job required him to establish close personal relationships with the officers of his company's European customers, in order to more precisely judge the taste which they sought in the tobacco they purchased. This work involved extensive entertaining and socializing with clients. A wife's presence was shown to be of considerable importance in *107 establishing the necessary social rapport. The primary difference between the above case and the one now before the Court is that we have not been given any similarly detailed explanation of the necessity of a wife attending a plumbing contracting convention. There may be good reasons why Ella Schmaus's presence at the conventions was beneficial to the company, but we have been shown none. We therefore hold that respondent's disallowance was proper. Having decided that the expenses of Ella Schmaus's attendance at the conventions were improperly deducted by the corporation, we come now to the related issue, i.e., whether the individual petitioners received a dividend when the corporation reimbursed Schmaus for her expenses. The respondent has determined that in 1958, 1960, 1961, and 1962 additional dividend income was received because of these reimbursements. The petitioner asserts that Ella Schmaus derived no benefit from attending the convention, because she went only at her husband's insistence. However, Schmaus wanted her to attend the conventions, so he thereby derived a benefit from having her expenses paid by the corporation. It was, therefore, proper to attribute the amount *108 of her expenses which were paid by the corporation to the individual petitioners as dividend income. The Commissioner's determination that additional dividend income was received in an amount equal to the convention expenses of Ella Schmaus is upheld. Roofing Materials Findings of Fact Roofing materials were given to William Mammen in 1960 by Industrial Roofing and Insulation Co., a company which did a small amount of business with L. R. Schmaus Co., Inc., William Mammen installed the materials himself. L. R. Schmaus Co., Inc., was in no sense the cause of Mammen's receiving the materials, nor was it in any way involved in the transaction between Mammen and Industrial Roofing. Opinion Roofing materials were given to William Mammen in 1960 by Industrial Roofing and Insulation Co. Mammen was vice president of the corporate petitioner and the son-in-law of Schmaus, the individual petitioner. The respondent has determined two deficiencies arising out of this transaction. The first is against the corporate petitioner in the amount of the value of such roofing materials. The deficiency notice explains that the corporation received "other income" in the amount of $600 because of *109 the "cost-free roof installation." The second deficiency was determined against the individual petitioner Schmaus. The notice of deficiency states that "dividend income" has been increased, but it does not explain the source of the dividend. At trial the respondent contended that one of the many components of the increase in dividend income was $600 which "is a constructive dividend resulting from a roof which was received by the son-in-law of the petitioner, principal shareholder of the company." The respondent's theory is that Industrial Roofing made a payment to L. R. Schmaus Co., Inc., disguised as a gift of roofing materials, and that the latter's president and principal stockholder caused his son-in-law, Mammen, to receive the materials. Respondent therefore concludes that the corporation received income, and that its principal shareholder received a constructive dividend. Looking at the corporate petitioner, we must first ask whether the corporation shall be deemed to have received anything at all, for if the corporation is found to have received nothing, actually or constructively, it becomes irrelevant to our inquiry whether the recipient of the roofing materials received *110 a gift or income. The testimony of the corporation's president Schmaus impressed us as being thoroughly reliable on this issue, and we are persuaded that the corporation did not request that the roofing materials be given to Mammen, and that the corporation had only a small amount of business dealings with Industrial Roofing. Schmaus's observation that the roofing materials were of a new type, designed for visual appeal, and that the roof in question was torn off after six months, persuades us that the intent of the donor was not to make a disguised payment to the corporate petitioner. A more likely explanation was the donor's desire to try out the new materials. Whatever the motive may have been, all the evidence persuades us that the corporate petitioner was not intended to be, and was not benefited either directly or indirectly, and was therefore not the recipient of income within the meaning of the Code. The fact that Mammen may have received income will not cause us to impute it to his employer. The respondent's reliance on *111 Commissioner v. Duberstein, 363 U.S. 278 (1960), and Bogardus v. Commissioner, 302 U.S. 34 (1937), is misplaced, for in neither case was the employer being charged with constructively receiving income because of something given to its employee. The former involved the question of whether an employee received income when a company with which his employer did business gave him a car. The latter involved the question of whether an exemployee received income when a company for whose predecessor he had worked paid him a gratuitous bonus. No suggestion is found in either case that if an employee receives a gift which is income to him that his employer will, ipso facto, also be held to have received income. Having found that the corporate petitioner received no benefit, however attenuated, from the transaction between its vice president and Industrial Roofing, we now turn to the individual petitioner, Schmaus, president and principal shareholder of the corporation. The respondent has determined that in 1960 the petitioner was the recipient of a constructive dividend from L. R. Schmaus Co., Inc., in an amount equal to the value of the roofing materials given *112 to William Mammen. Although it is not clear what facts the respondent feels give rise to such a constructive dividend, it appears that he relies upon the facts that the petitioner was the president and principal shareholder of L. R. Schmaus Co., Inc., and that petitioner's son-in-law, Mammen, was its vice president. These facts become relevant only if it is found that something passed from the corporation to Mammen, and we have held that nothing did. We hold that L. R. Schmaus Co., Inc., neither gave nor caused Mammen to receive the roofing materials from Industrial Roofing. We hold further, that it played no part in helping Mammen install the materials on his house. We, therefore, hold that petitioner Schmaus received no constructive dividend because of Industrial Roofing's transactions with William Mammen. Christmas Gifts and Bonuses Findings of Fact We find that Louis R. Schmaus made the following cash withdrawals from the corporation: 1960
$3,000
1961
3,000
1963
2,000 We find that in 1960 and 1963 these funds were used to pay Christmas bonuses of between $10 and $50 each to the corporation's hourly-paid employees and to purchase Christmas *113 presents for customers of the corporation. No evidence was adduced as to how the funds were used in 1961. Opinion The corporation has claimed deductions for moneys withdrawn by Louis R. Schmaus in 1960, 1961, and 1963. The respondent has determined that the amounts withdrawn in 1960 and 1961 were not allowable deductions to the corporation, and in computing the amount of the loss carryback deduction from 1963, he has disallowed a deduction for the cash withdrawn. The respondent has also determined that because the withdrawn funds were not deductible by the corporation that they constituted additional dividend income to the individual petitioner in each of the years 1960, 1961, and 1963. This issue is entirely factual, and we have found that Schmaus spent the money which he withdrew in 1960 and 1963 to pay cash Christmas bonuses to the corporation's construction workers, and to purchase Christmas presents for customers. We are unable to make a similar finding as to the disposition of the funds withdrawn in 1961, because petitioner introduced no evidence as to 1961 and thus failed to meet the burden of proof. No evidence was introduced to show what portion of the total amount *114 of each year's withdrawal was used in giving bonuses to employees, or what portion was used in buying presents for customers. It was shown, and we have found, that the bonuses were paid in amounts of between $10 and $50 to the corporation's construction workers. These amounts were of a reasonable size for the purpose of paying Christmas bonuses, and we hold that they were properly deductible. However, we are not prepared to say that amounts spent for business gifts, the cost of which are unspecified, and the donees of which are identified only as "customers" are, without more, deductible business expenses to the corporation. In order to be deductible, business gifts must be shown to be ordinary and necessary expenses within section 162. Without knowing the cost of each gift and the identity of the donee we cannot say whether it was either ordinary or necessary, for it goes without saying that in order for the cost of a business Christmas present to be deductible, it must be reasonable in amount. Reasonableness must be determined upon all the facts, among the most important of which is the corporation's relationship with a particular recipient. Here we know only that the recipients *115 were "customers." Although it is not necessary for the corporation to produce a receipt for each item purchased, other evidence must show how much was spent on each customer's present. The inability of petitioner's president to recall either what was given away or to whom it was given constitutes a failure of proof. We, therefore, hold that the corporation was entitled to no deduction for expenses it incurred giving Christmas presents to customers in 1960 or 1963. [3]
*116 The petitioner made no attempt to allocate the total amount of money which its president withdrew in each year between the bonuses he paid and the Christmas presents he gave away. Since the cost of each year's bonus payments was deductible, but the cost of the Christmas presents was not, such an allocation is necessary. In our judgment, a reasonable allocation would ascribe one-half of the total amount withdrawn by Schmaus to payment of bonuses and one-half to the purchase of Christmas gifts, and we so hold. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). Consequently, one-half the amount determined by the respondent to have been improperly deducted in 1960 is allowed, and one-half the amount claimed by the petitioner in computing his 1963 loss carryback deduction is allowed. The respondent's determination that no part of the amount withdrawn by Schmaus in 1961 is deductible is upheld. We have found that no part of the funds withdrawn in 1960 and 1963 were used for the personal purposes or benefit of Louis R. Schmaus. It follows that he received no additional income because of the withdrawals made in those years. No evidence was introduced to show how the funds *117 which were withdrawn in 1961 were used. It follows that the individual petitioner has failed to overcome the presumptive correctness of the determination of a constructive dividend for 1961, and we so hold. Windows and Carpeting Findings of Fact In 1960 William Mammen caused the L. R. Schmaus Co., Inc., to purchase $989 worth of carpeting and $660 worth of windows which were then installed in his home. Louis R. Schmaus did not authorize and was not aware that the corporation had purchased these goods, and became aware of the expenditures only during the course of the present controversy. The respondent has determined that these expenditures constituted a constructive dividend to Louis R. Schmaus and, accordingly, has charged him with receiving additional 1960 income. Opinion The theory upon which the respondent determined that Louis R. Schmaus had received dividend income because the corporation had paid for carpeting and windows which were installed in the home of its vice president, William Mammen, in 1960 is explained on brief as follows: Because Louis R. Schmaus was the sole stockholder of the L. R. Schmaus Co., Inc. and because these expenditures were made by the *118 corporation on behalf of persons who were the natural object of his bounty, respondent determined that these items constituted taxable income to him. * * * In the usual constructive dividend case, economic benefits of the corporation's expenditure flow directly to a shareholder. Here, the benefit did not flow to the shareholder, but instead flowed to William Mammem, in whose home the carpet and windows were installed. It is clear that the general principles governing assignment of income which were laid down in Helvering v. Horst, 311 U.S. 112 (1940), require income to be taxed to one who causes another to receive it, if the donor could have received it himself. These principles have been used to find a constructive dividend in cases where the dominant stockholder caused corporate distributions to be made to a third person in order to serve some purpose of his own. Commissioner v. Makransky, 321 F. 2d 598 (C.A. 3, 1963); Byers v. Commissioner, 199 F. 2d 273 (C.A. 8, 1952), certiorari denied 345 U.S. 907 (1953); *119 Whitehead v. Commissioner, 148 F. 2d 718 (C.A. 4, 1945); Clark v. Commissioner, 84 F. 2d 725 (C.A. 3, 1936). The instant case is distinguishable on its facts. Louis R. Schmaus, the corporation's only stockholder, had no actual or constructive knowledge of the expenditures in question. We have concluded that Mammen was in a position to and did authorize these expenditures, and received the entire benefit from them. No other conclusion is possible from the testimony of Louis R. Schamus, and we believe such testimony. This issue is therefore resolved against the respondent. Worthlessness of Securities Findings of Fact During the years 1951 through 1953, the individual petitioner purchased 20,000 shares of Cape Copper Mines, Ltd., a Canadian corporation, for $10,379.10. He attempted, without success, to sell the stock in 1960, 1961 and 1963. Investigation revealed that an order of the Provincial Secretary of Ontario dated July 25, 1960, canceled the corporation's Letters Patent and declared it dissolved on August 29, 1960. In 1951 the individual petitioner purchased 2,000 shares of Matarrow Lead Mines, Ltd., another Canadian corporation, for $988. In *120 1953 this company's name was changed to Consolidated Matarrow Mines, Ltd., and in 1955 it was changed again to Jeanette Minerals, Ltd. At the time of the 1955 name change, petitioner's 2,000 shares of Matarrow were exchanged for 642-6/7 shares of Jeanette. The latter company's Letters Patent were canceled and it was dissolved on October 10, 1961, by an order of the Provincial Secretary of Ontario dated September 5, 1961. Schmaus attempted, without success, to have two brokers sell the stock of Jeanette Minerals, Ltd., but we do not know when such attempts were made. Opinion Part of the deficiency in the individual petitioners' case arises out of the respondent's determination that $18,802.67 was improperly deducted on their 1961 return because of securities becoming worthless in that year. The petitioners have conceded portions of this amount and the only dispute remaining concerns the worthlessness of Schmaus's stock in the two Canadian companies, Cape Copper Mines, Ltd., and Jeanette Minerals, Ltd. Schmaus alleges that the stock of Cape Copper Mines, Ltd., became worthless in 1960, and that he deducted his basis of $10,379.10 in 1961 because his preliminary investigation *121 indicated that the stock was worthless in the later year. Both 1960 and 1961 are before us, but the record does not establish that either stock became worthless in either year. The petitioner bases his claim for a deduction on section 165(g) which allows the taxpayer to treat losses on securities which become worthless during the taxable year as capital losses. As the regulations point out at section 1.165-5(c), the security must become "wholly worthless" during the taxable year. Timing is important, and it is not enough to show that a security is worthless in the year when the loss is claimed; it must be shown that the security became worthless in that year. Bella Feinstein, 24 T.C. 656. Petitioner has shown that as a consequence of failing to file its "Annual Returns" with the Ontario government, Cape Copper's Letters Patent were canceled and it was declared dissolved in 1960, but dissolution and worthlessness are not synonymous. It is equally as plausible to assume that the formal action by the Provincial Secretary would come after economic worthlessness had occurred. The petitioner showed that he tried to sell the stock in 1960, 1961, and 1963 but was unable *122 to do so because "there was no market." Here again, the proof does not preclude the possibility that the stock became worthless prior to his attempts to sell. In order to show that the stock became worthless in 1960, it must be shown to have still had value in 1959, and the record is thus deficient, and respondent's determination is sustained. Turning now to Jeanette Minerals, Ltd., the petitioner received these shares in exchange for his stock in Consolidated Matarrow Mines, Ltd., in 1955. Jeanette's Letters Patent were canceled, and it was declared dissolved in 1961, but as was the case with the Cape Copper Mines, Ltd., stock, this fact alone does not establish 1961 worthlessness. Petitioner attempted unsuccessfully to sell this stock to two different brokers; but he has failed to show us when these attempted sales occurred. From the evidence presented we are unable to find that the stock of Jeanette Minerals, Ltd., became worthless in 1961. Petitioner raises an alternative theory on brief as to his stock in Jeanette Minerals. He argues that this stock must have had value in 1955, for in that year it was issued in exchange for his stock in Matarrow Mines. From this hypothesis *123 he concludes that the stock of Jeanette Minerals must have become worthless sometime between its issuance in 1955 and the termination of its legal existence in 1961. From this conclusion, petitioner argues that as section 1212 stood prior to the 1964 amendments, [4] it entitled him to a carry-forward deduction to the years presently before the Court (1958 through 1963). The fallacies of this reasoning are obvious. Again, the year of worthlessness is not known, and even if we were to ignore this fallacy, and assume, say, 1956 was the proper year, petitioner's position would be no better. Pre-1964 section 1212 did permit a carryover; it did not allow taxpayer a carry-over loss to whichever of the next five years he might elect. It required that a net capital loss in one year be applied *124 against the net capital gains of each of the succeeding five years, and that in any year when the net capital loss exceeded that year's net capital gain, the difference would be carried over as a short-term capital loss to the next year. None of the detailed facts necessary to such computations are before us. The respondent's denial of any losses arising out of the petitioner's ownership of the stock of Jeanette Minerals is sustained. Decision will be entered under Rule 50. Footnotes
1. So stipulated. The $189 discrepancy is not explained.↩
2. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
3. We observe that for the year 1963, section 274 applies and furnishes additional reasons for disallowance. Under this section amounts claimed as deductions for gifts must comply with explicit rules, in addition to meeting the requirements of section 162. A gift is defined in section 274(b) as an item excludable from gross income of the recipient under section 162. Under this definition, the Christmas bonuses paid to the construction workers would not be considered "gifts" and are therefore deductible only by reference ot section 162. However, the Christmas presents given to customers are squarely within the reach of 274. As applied to the present facts, section 274(d)(3) requires that in order to deduct the cost of Christmas presents, the taxpayer must substantiate his claim with records or other evidence which show (A) the gift's cost, (B) the date it was given and a description of it, (C) its business purpose, and (D) the business relationship to the taxpayer of the person receiving the gift. In addition, section 274(b)(1)↩ imposes a $25 annual limitation on the amount which can be spent on gifts to any individual.
4. Section 1212 - (prior to 1964) If for any taxable year the taxpayer has a net capital loss, the amount thereof shall be a short-term capital loss in each of the five succeeding taxable years to the extent that such amount exceeds the total of any net capital gains of any taxable years intervening between the taxable year in which the net capital loss arose and such succeeding taxable year.↩